THE PEOPLE v. JAMES CARR.

*Criminal law—Indictment—Conduct of prosecutor.*

1. Where a respondent was proceeded against for the crime of murder by *indictment*, without a preliminary examination, which purported to set out the crime specifically and circumstantially in the common-law method, this cannot be overlooked in considering the case, and it must be applied and construed by common-law rules. *Chapman v. People*, 39 Mich. 357.

2. In this case the action of the prosecuting attorney in conducting the examination of a necessary witness for the people, which is summarized in the opinion, is held sufficient ground for granting a new trial.

3. Trial courts have the power, and it is their legal duty to protect witnesses and parties from unfair dealing, and to take pains to prevent mischief from what has not been seasonably checked. Public prosecutors are sworn ministers of justice, and not advocates employed to procure convictions without regard to legal guilt or innocence; and this relation, which our statutes have plainly endeavored to secure from perversion, should be carefully guarded.[1]

Error to Gratiot. (Hart, J.) Argued January 27, 1887. Decided February 3, 1887.

Indictment for murder. Respondent was convicted. Judgment reversed, and respondent remanded for a new trial. The facts are stated in the opinion.

*Wisner & Draper*, for respondent.

*Moses Taggart*, Attorney General, for the People.

CAMPBELL, C. J. Respondent was convicted of the murder of one Frankie Osborn, who died June 16, 1884, of bruises inflicted the day before, or just before the beginning of that day. The only witness who connected her death with violence committed on her was Dr. Scott, who attended her on the fif-

---

[1] See *People v. Dane*, 59 Mich. 550 (head-note 1).

teenth, during the day and about midnight, and to whom she made an *ante mortem* declaration. His testimony on this trial was that she described the offense as entirely committed by one Murphy, who is now deceased. The court instructed the jury that the case relied on by the prosecution could only be made out by the joint action of respondent and Murphy, the testimony of which was given solely by one Daisy Young, who placed the violence during the day, and not the night, of June 14. As the case went to the jury, no claim was made for the prosecution, as the court put it to the jury, that death was caused by any act of Carr alone, or any act previous to the one just referred to. There was testimony of blows inflicted several days before both by Carr and by Murphy separately, but the medical testimony shows they had nothing to do with the fatal result, and no claim was made that they did.

No charge was asked, and no error is assigned, upon the form of the indictment, and therefore we shall not rest any decision upon it. But it becomes somewhat material in considering such questions as do arise on the record. There is no preliminary examination shown, and the complaint was not by information, but by indictment. Neither is the indictment in the general form allowed by statute. It purports to set out the crime specifically and circumstantially in the common-law method; so that, in considering the case, this cannot be overlooked, and it must be applied and construed by common-law rules. *Chapman v. People,* 39 Mich. 357.

A brief outline of the controversy will show all that is necessary to understand the questions presented for decision.

Respondent, who is evidently a very depraved man, but who cannot, under an indictment for murder, be convicted unless he is guilty of murder, was owner of a house of ill fame kept for him by one McCarty, in the town of Meredith, in Clare county. Respondent did not live there. There were four women who were inmates of the house, of whom

the murdered woman was one. There was a dispute whether Daisy Young was there until after this woman died. If she was not then an inmate of the house, there was no case made out. One Murphy was bar-tender, and a special intimate of the dead woman.

At some time in the day or night of June 14, Frankie Osborn, while in a lower room where dancing was going on, was brutally and fatally struck and kicked by Murphy; and Daisy Young said that Carr, the respondent, beat and mal-treated her first, and then told Murphy to finish her, he himself going away, and not being present while Murphy so abused her. She was taken upstairs to a bed-room, where, on the next day, Dr. Scott attended her twice,—the second time late at night; and it was during the second visit that he made a full examination, and ascertained the extent and character of the injuries, and told her they would be speedily fatal, and urged her to explain how they were given. She told him that Murphy was the person who inflicted the violence, describing it fully, and naming no one else. Dr. Scott denied positively that she made any allusion whatever to Carr. No complaint was made, and no arrest had, for some time thereafter. It does not appear from the record that any such action preceded the indictment. This indict-ment was found March 18, 1885, at which time Murphy was dead. In May, 1885, a trial was had in Clare county, but the jury disagreed, and were discharged. The judge who tried the cause (Judge Hart) then, upon motion, changed the venue to Gratiot county, and in the latter county presided at the second trial, which was held in December, 1885. Defendant was convicted of murder in the second degree, and sentenced to 15 years' imprisonment in the State prison at Jackson. The cause comes up on writ of error.

The indictment charges Carr (mentioning no other person) with striking the deceased with a pair of brass knuckles on the tenth of June, 1885, and thereby giving her a mortal

wound on the side of her head, of which she afterwards died
on the fifteenth. There is in the same count, referring to
the same occasion, language which, although indefinite, may
perhaps have been designed to refer to more than one fatal
injury; but she is alleged throughout to have died of
"wounds."

The testimony shows very clearly that, whoever may have
been the cause of her death, she did not die of wounds on her
head or elsewhere; and that the fatal injury was a blow or
kick upon her abdomen, possibly aggravated by similar vio-
lence on her chest, which produced no wound, but led to gan-
grene of the intestines, which were already diseased, and
from this followed rupture and hemorrhage that proved fatal.

This indictment made no reference to the criminal agency
of any one but Carr, who was charged with personally com-
mitting the deadly acts. . Daisy Young, on whose uncorrob-
orated testimony, contrary to the dying declarations of the
decedent, the whole conviction rested, stated that Carr,
although inciting Murphy's assault, was not personally present
while it was proceeding to its fatal close.

As Dr. Scott was the necessary and only witness who
proved the cause of death, and as the dying declarations
entirely exonerated Carr, an attempt was made by the prose-
cution to destroy his testimony, so far as it went against their
side of the case, by endeavoring to make out that he had
made contradictory statements. There was, however, no pre-
tense that he had ever introduced criminating statements
against Carr. But it was intimated and asserted that he had
given the dying declarations on the first trial as implicating
Murphy as principal, but not as sole offender.

It is in regard to the course taken and allowed in this
direction that we shall consider the case. There was some
hearsay testimony improperly allowed as to statements of the
deceased concerning her regard for Murphy before any of

these events occurred, as well as some other doubtful matters of minor importance.

During the examination of Dr. Scott, who was a necessary witness for the prosecution, and who was not shown to have made any seriously conflicting statements at all material to the issue, the prosecuting counsel, from a very early stage in the examination, made several very insulting inquiries of the witness concerning insinuated requests to the grand jury for secrecy as to what he swore to before them, all of which he denied, and also concerning statements on the former trial, which he substantially denied. In doing this, counsel undertook to treat him as an adverse witness, whom he was at liberty to deal with as such.

After pursuing this course for some time without interruption, the prosecutor then produced what he claimed to be a transcript of the proceedings on the former trial, but which · was in no way verified by any one, and was not admissible evidence of those proceedings. *Misner v. Darling*, 44 Mich. 438; *Edwards v. Heuer*, 46 Id. 95; *People v. Sligh*, 48 Id. 54. Not only was this done, but counsel, to whose course, after this, objection was constantly and unavailingly taken, proceeded to make averments before the jury of what the transcript contained, and assertions that the witness was falsifying and contradicting himself. One or two examples will perhaps be sufficient to illustrate this remarkable proceeding. When an objection was made to an alleged quotation from the transcript, counsel said :

"I want to get at the facts in this case, and I have the right to call his attention to this testimony for the purpose of refreshing his recollection. Now he comes upon the stand, if your honor please, and by his testimony seeks to connect no man except this man that is dead with the murder of this girl, while in his testimony that was given before he implicated another."

*Defendant's Counsel.* "I except to the remarks of counsel, and ask the court to direct him to desist from them."

*The Court.* "In what respect are they objectionable?"

*Defendant's Counsel.* "I don't think counsel has any right to make them, and I object to the language as entirely beyond what counsel ought to indulge· in at this stage of this case, and under these circumstances. That is my objection."

*The Court.* "Perhaps I don't see it; and, if counsel don't desire to make it known, you may take your exception."

*Defendant's Counsel.* "I can't explain it. The language explains itself, your honor."

*The Court.* "If it is not explainable, I don't know as it can do much damage. Take your exception."

It could not require explanation to support an objection when counsel was making before the jury positive assertions that a witness then on the stand had on a former occasion given a contrary showing concerning the chief fact in·the case.

These assertions, thus tolerated, were repeated over and over; and similar, but frequently specific, objections disallowed. The witness was also subjected to a very offensive style of inquiry into his reasons for asking the dying girl concerning the circumstances of the crime,—a course which, if not his absolute duty, was eminently proper and necessary to the furtherance of justice. Assertions were repeatedly made that the witness was not telling the truth, and that he was testifying contrary to his former testimony; and he was charged with trying to saddle Carr's crime on Murphy. This particular assertion was reiterated, with others of similar character. The examination by defendant's counsel was interrupted by grossly rude and improper remarks; one being a profane exclamation that the prosecutor wished he had the witness where he could impeach him.

After all these assertions had been made before the jury concerning Dr. Scott's former testimony, unsupported by any proof, and denied by him, the charge gave the jury no caution on the subject, and left his testimony as if it had been to that extent impeached.

We have seldom had a record before us which impressed us

so unpleasantly concerning the conduct of the trial by the prosecution. No decent witness would willingly appear in court to be made subject to such outrage. And it is impossible not to see the effect on the case itself. A witness who was not, and perhaps could not have been, directly impeached, but whose story, so far as material, was entirely consistent on the stand, was made by this process to appear as if he had been guilty of falsification; and this, not by proof, but by the assertion of the prosecutor, whose statements of fact, not ruled out when objected to, could not fail to impress the jury. Trial courts have the power, and we think it is their legal duty, to protect witnesses and parties from unfair dealing, and to take pains to prevent mischief from what has not been seasonably checked. We have had, on more occasions than were pleasant for us, to point out that prosecutors are sworn ministers of justice, and not advocates employed to procure convictions without regard to legal guilt or innocence; and this relation, which our statutes have plainly endeavored to secure from perversion, should be carefully guarded.

The judgment must be reversed, and the prisoner remanded for a new trial. As we have no means of knowing what was before the grand jury, and have not all the evidence before us now, we cannot release respondent on bail; but he will be held in the proper county in custody to await further trial, if so contemplated.

The other Justices concurred.