*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
September 2, 2021

v

No. 353140
Presque Isle Circuit Court
LC Nos. 19-003234-AV; 19-
003235-AV

AMANDA ASHLEIGH-MARIE REED,

Defendant-Appellant.

Before: RONAYNE KRAUSE, P.J., and BECKERING and BOONSTRA, JJ.

RONAYNE KRAUSE, P.J. *(dissenting)*

I respectfully dissent because, on this record, killing the dogs is unwarranted. The record evidence does not permit a reasonable trier of fact to find any greater likelihood that the dogs attacked the horse than that a wild animal attacked the horse. In addition, even if the conviction was to be upheld, the manner in which the dogs escaped defendant's brief lapse of attention, and the extensive countermeasures the owner took without any prompting to ensure that no such escape could ever recur show that killing the dogs, as opposed to the statutorily-permitted alternative of releasing the dogs to defendant's care, would be an inappropriate sanction. Finally, at a minimum, the trial court erred by failing even to recognize that an alternative to killing the dogs existed, let alone giving that alternative any consideration. I would reverse, or at least remand for reconsideration of the appropriate sanction.

## I. VALIDITY OF MCL 287.286A

I agree with the majority's conclusion that the Dog Law of 1919 (the Dog Law), MCL 287.261 *et seq.*, was neither implicitly nor explicitly repealed by the enactment of the Dangerous Animals Act (DAA), MCL 287.321 *et seq.* In relevant part, the Dog Law generally protects persons and property from dogs; whereas the DAA protects persons and dogs from animals that may or may not be dogs. Notably, the DAA does not appear to protect property, and because there is no dispute that the horse in this matter is property, the DAA is inapplicable. It is therefore unnecessary to consider what, if any, circumstances might create a conflict between the two laws. I also agree that the Dog Law is not void for vagueness due to its failure to provide definitions for the words "destroy" or "property."

-1-

## II.  LEGAL PREREQUISITES

As an initial matter, at oral argument, the prosecutor stated, "I don't speak for the dogs here, I speak for the victim, which is the horse that had to be destroyed."  I find this comment troubling for a number of reasons.

Although MCL 780.652(1)(f) suggests the theoretical possibility of an animal being a "victim of a crime," and although many people develop great emotional bonds with animal companions, animals are not yet generally considered to have the kind of legal personhood that would permit them to be "victims" absent a specifically conferred statutory right.  I am aware of no such general, all-encompassing right or status presently having been conferred by the Legislature.  E.g, compare MCL 750.50(1)(i) (" 'person' means an individual, partnership, limited liability company, corporation, association, governmental entity, or other legal entity") with MCL 750.50(1)(b) (" 'animal' means a vertebrate other than a human being"); compare MCL 324.8305(2) (" 'person' means an individual, partnership, corporation, association, governmental entity, or other legal entity") with MCL 324.8302(7) (" 'animal' means all vertebrate and invertebrate species, including, but not limited to, human beings and other mammals, birds, fish, and shellfish"); compare MCL 287.703(ggg) (" 'person' means an individual, partnership, corporation, cooperative, association, joint venture, or other legal entity including, but not limited to, contractual relationships") with MCL 287.703(b) (" 'animal' means mollusks, crustaceans, and vertebrates other than human beings including, but not limited to, livestock, exotic animals, aquaculture species, and domestic animals").  Under the Dog Law, horses are defined as livestock, MCL 287.261(2)(a), and are undisputedly "property" for purposes of MCL 287.286a(1)(b).  Certainly, the emotional bonds we form with animals would lead most of us to intuitively regard horses as "victims," notwithstanding their legal status.  However, any degree of personhood attributed to the horse must also be equally attributed to the dogs: either they are both property, or they are both quasi-people.  There is no intellectually honest and logically consistent way to impute *de facto*, if not *de jure*, personhood to only the horse or to only the dogs.[1]

The reason this matters is that prosecutors are uniquely more than merely advocates for a particular client.  Obviously, prosecutors *are* advocates, and they are expected to prosecute zealously.  However, they are burdened by additional "specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."  See comment to MRPC 3.8.  If the horse is a victim, then the dogs are defendants.  Although it is true that the prosecutor does not speak for defendants in criminal proceedings, prosecutors may nevertheless not entirely disregard defendants' rights and interests.  As has long been observed, "prosecutors are sworn ministers of justice, and not advocates employed to procure convictions without regard to legal guilt or innocence."  *People v Carr*, 64 Mich 702, 708; 31 NW 590 (1887); see also *People v Jones*, 468 Mich 345, 354; 662 NW2d 376 (2003).  A prosecutor "is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."  *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935).  Although the prosecutor at oral argument may, understandably, have simply chosen his words

---

[1] I believe that many citizens of this state would welcome legislation granting some degree of rights and personhood to some animals, but any such public policy is a matter for the Legislature.

poorly when put on the spot, I am concerned by the possibility that those words instead show the prosecutor to have lost sight of the unique obligations that come with his office.

I additionally observe that if the horse "had to be destroyed" as a result of his injuries, then strictly speaking, they were not actually destroyed by whatever creature caused those injuries. Under MCL 287.286a(1)(b), it must be established that a dog "has destroyed property." I do not accept that an injury is tantamount to destruction; rather, an injury is akin to damage, whereas death would be akin to destruction. The evidence leaves some doubt whether the death of the horse was truly inevitable, as opposed to merely recommended, in which case the actual "destruction" of the "property" was a choice made by the horse's owners. Nevertheless, at the commencement of the hearing in the district court, defense counsel stipulated that the horse "needed to be euthanized as a result" of the injuries he sustained. To the extent the horse's death was therefore stipulated to be a necessarily and inevitable consequence of his injuries, it would be fair to construe the injuries as "destroying property" under MCL 287.286a(1)(b).

Conversely, the prosecution also charged that "the dog[s] showed vicious habits or molested a person..." under MCL 287.286a(1)(d). Even if the dogs did attack the horse, that attack would constitute a single data-point, which cannot be extrapolated into "habits." Not only did the legislature use the plural word "habits," the word "habit" refers to a pattern or tendency of repeated conduct. See *Meriam-Webster's Collegiate Dictionary (11th ed)*. A single incident, no matter how appalling, simply cannot constitute a "habit." There is no evidence that these dogs ever attacked any other living being. Furthermore, as noted, the horses are considered livestock, not "persons." Therefore, although it does not appear that the district court relied on MCL 287.286a(1)(d), I would note that on this record, it is impossible for that statutory subsection to have been proven.

### III. SUFFICIENCY OF THE EVIDENCE

Ultimately, there is no dispute that the horse suffered grave injuries and, for one reason or another, died of those injuries. The question is whether these dogs committed those injuries.

Other than the horse and the dogs, there were no witnesses to what exactly transpired in the barn on October 15, 2019. Nevertheless, it is well-established that the essential elements of a crime may be proved beyond a reasonable doubt on the basis of "circumstantial evidence and reasonable inferences arising from that evidence." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation omitted). Furthermore, appellate courts should defer to the trier of fact's assessment of "what inferences may be fairly drawn from the evidence" and "the weight to be accorded those inferences." *Id*. (quotation omitted). Nevertheless, the trier of fact may not engage in speculation, and it may not find the elements of a crime proven by simply refusing to accept the evidence that was introduced. *People v Bailey*, 451 Mich 657, 673; 549 NW2d 325 (1996). A conclusion is a permissible inference if the evidence logically and selectively points toward only one explanation; whereas a conclusion is an impermissible conjecture if it is plausible but no more probable than at least one other possible explanation. *Skinner v Square D Co*, 445 Mich 153, 164-166; 516 NW2d 475 (1994). It is the role of the appellate courts to ensure that the factfinder's inferences "have adequate basis in record evidence." *People v Hoffmeister*, 394 Mich 155, 159;

229 NW2d 305 (1975).  This Court's review of the factual findings by the district court, sitting without a jury, is therefore highly deferential, but not infinitely so[2].

The majority, the prosecution, and the trial court all correctly conclude that it is possible that the dogs attacked the horse.  Notably, however, the trial court's conclusion that the dogs *actually did* attack the horse was based on its belief that there was "just no other explanation for" how the horses came to be injured.  The evidence shows that belief to be false.

The state of the dogs themselves is highly incongruous with having attacked the horse.  First, the dogs were found in another stable from the horse; if indeed they had attacked the horse, then they had also inexplicably decided to break off the attack, and they inexplicably decided to hide inside the barn instead of leaving the same way they came in.  In other words, the evidence suggests that they were afraid of something outside the barn.  Secondly, the dogs suffered small lacerations and torn gums; but they sustained no fractures, crushing injuries, or other blunt trauma that would be consistent with being kicked or thrown by a horse.  In other words, their injuries were not consistent with an altercation with a horse.  Third, the evidence showed that the dogs acted unprecedentedly out of character in the manner they departed from their owner when she "turned [her] back for maybe 15 seconds."  Notwithstanding the testimony that the dogs' breed was bred for "bull-baiting," the practice of "bull-baiting" was described as involving intentional direction by a human, not a spontaneous excursion.  They were not described as, say, hunting or pursuit dogs.[3]  Finally, the dogs were described by defendant as "cowering" and "scared;" and by the horse's owner as growling, barking, and "posturing . . . like it didn't want us in the barn."  This display of defensiveness and fear is clearly inconsistent with the conduct of an aggressive attacker.  Consequently, the dogs' actions and injuries are far more consistent with a fourth animal having been involved, and moreover, a fourth animal that the dogs found fearsome.

The evidence also shows that the involvement of a fourth animal was more than a mere possibility.  If defendant's dogs were able to gain entry to the barn or the stall, then they were not the only animals capable of doing so.[4]  The horse's owner testified that there was blood in both the horse's stable and the dogs' stable, as well as outside in the pen area.  The horse's owner also agreed that his property was rural, and it was not uncommon for him to encounter coyotes or bears.

---

[2] I therefore disagree with the majority's contention that I am "engag[ing] in fact-finding that is not supported in the record."  I am *pointing out* fact-finding that is not supported by the record.  Furthermore, as I will discuss, the problem with the fact-finding made in this matter is deeper than just whether the trial court's conclusion was arguably supported by the evidence adduced.  The problem is also that defendant was totally deprived of any opportunity to discover potentially-exonerating evidence, and there is a strong probability that there would have been exonerating evidence to discover if defendant had been allowed to do so.  The majority understandably focuses on the horrifying injuries suffered by the horse, the less-serious injuries suffered by the dogs, and the fact that most of the blood *apparently* did not come from the dogs.  I do not mean to suggest that doing so is in any way improper, but I believe the majority's focus is too narrow.

[3] Furthermore, there was no evidence that the dogs were ever trained for "bull-baiting" or any similar kind of dangerous or hostile practice.

[4] The kind of gate through which access to the horse's stall is gained is therefore irrelevant.

-4-

Furthermore, the blood evidence was destroyed without providing defendant an opportunity to analyze that blood. The veterinarian provided an extremely evasive answer when asked whether she could identify what kind of animal caused the horse's injuries. She testified that if she "was allowed to run a test," she could have differentiated between equine blood and canine blood, but she was not asked to perform any such test. Although it was not necessarily unreasonable to assume that the blood came from the horse, such an origin was nevertheless only an untested assumption.

Prosecutors are not obligated to conduct forensic tests on the off chance that they might exonerate a particular defendant. See *People v Anstey*, 476 Mich 436, 460-462; 719 NW2d 579 (2006). If the state fails to preserve evidence that is merely potentially exonerating, generally no due process violation ensues unless the state failed to preserve the evidence in bad faith. *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed 2d 281 (1988); *People v Bosca*, 310 Mich App 1, 27; 871 NW2d 307 (2015). However, where the evidence is of a clearly critical nature and there is a "reasonable possibility" beyond mere speculation that the evidence would have been exculpatory, it is "appropriate to apply a stricter standard than *Youngblood*." *People v Huttenga*, 196 Mich App 633, 643; 493 NW2d 486 (1992); see also *California v Trombetta*, 467 US 479, 488-489; 104 S Ct 2528; 81 L Ed 2d 413 (1984) (prosecutor may have a duty to preserve evidence that has an immediately apparent exculpatory value and that the defendant would be unable to reasonably obtain). In other words, what constitutes "bad faith" is a continuum dependent upon context; in particular, the degree to which state actors should have realized before the destruction of evidence that it would have probable (rather than merely possible) value to the defense and that the defense would not reasonably be able to obtain a substitute for that evidence after its destruction.

It should have been obvious from the outset that there would be enormous probative value in knowing which animal or animals produced the blood. It should have been obvious that once the blood was washed away, defendant would be totally incapable of conducting any kind of forensic analysis. It should have been equally obvious that defendant would be unable to conduct any kind of bite mark analysis without access to the horse, and that an appropriately-trained veterinarian would be the only professional able to conduct such an analysis. It should have been obvious that, in the absence of any human eyewitnesses, any forensic testing that could be done would improve the ratio of direct to circumstantial evidence, thereby reducing the need to depend upon inferences. Furthermore, there is more than a mere possibility that it would have been exculpatory. The behavior of the dogs and the nature of their injuries strongly suggest that a fourth animal was involved in whatever happened to the horse, and the evidence shows that a fourth animal could easily have become involved. At no time could defendant have preserved the blood or the horse for testing herself. Under the circumstances, I would find their destruction to be a due process violation. Minimally, the trial court should have at least considered drawing an adverse inference in favor of defendant. See *People v Cress*, 250 Mich App 110, 157-158; 645 NW2d 669 (2002), rev'd on other grounds 468 Mich 678 (2003).

When looking at the totality of the evidence, it is certainly plausible, for the reasons outlined by the majority, that the dogs attacked the horse. However, I do not agree that the evidence tends to favor that possibility. It appears that instead of taking into consideration the totality of the circumstances and evaluating the deductions that could reasonably be drawn from the evidence, the trial court was moved primarily by the indisputably horrifying nature of the

horse's injuries rather than the minimal extent to which the evidence casts light on how the horse sustained those injuries. Under the circumstances of this case, I would find that there is no greater likelihood that the dogs attacked the horse than that the dogs fought off a wild animal that attacked the horse. As noted, it is the role of this Court to determine whether a factfinder's conclusion is a proper inference or improper speculation. I would find that the trial court clearly erred by concluding that the most likely scenario, let alone the only possibility, was that the dogs attacked the horse.

IV. REMEDY

Finally, I observe that the trial court had the discretion to "either order the dog killed, or confined to the premises of the owner." MCL 287.286a(2). A trial court abuses its discretion by choosing an outcome outside the principled range of outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). I conclude that the trial court abused its discretion for two reasons.

First, the trial court's bench ruling strongly suggests that the court incorrectly believed that killing the dogs was the only option available upon finding that they attacked the horse, or perhaps that its choices were between killing the dogs or doing nothing. A trial court necessarily abuses its discretion if it fails to recognize that it has discretion and therefore fails to exercise that discretion. See *People v Merritt*, 396 Mich 67, 80; 238 NW2d 31 (1976). Similarly, "[a] trial court necessarily abuses its discretion when it makes an error of law." *People v Waterstone*, 296 Mich App 121, 132; 818 NW2d 432 (2012). The fact that the trial court seemingly never even considered the possibility of confining the dogs to defendant's premises would, at a minimum, require this matter to be remanded for the trial court to explicitly consider that possibility on the record.

Secondly, at the bench trial, defendant described extensive measures that she undertook almost immediately after the attack to ensure that the dogs would be incapable of escaping again. Those measures included a kennel to keep them constrained while outside, an electric fence, microchipping, a cable tether just long enough to reach the door of her house, and heavy-duty collars. She further admitted to having been "neglectful" in failing to keep the dogs on their leads on the day of the attack. It is notable that she undertook these measures of her own volition. It is also notable that, as discussed, the dogs never previously displayed any aggression or spontaneously left their owner's yard unaccompanied, and the evidence that the dogs were responsible for the horse's horrific injuries was weak. Under the totality of the circumstances, keeping in mind the goal of protecting *all* involved interests, including those of the public, the neighbors, defendant, the horse, and the dogs, I would conclude that ordering the dogs killed was an unprincipled and excessive outcome. Even if the trial court's conclusion that the dogs attacked the horse is upheld upon highly deferential review, I would nevertheless conclude that the trial court abused its discretion by ordering the dogs killed instead of confined to defendant's premises.

As the majority eloquently explains, what happened to the horse is undeniably tragic and horrifying, and its owners obviously suffered a grievous and incompensable loss. However, under the circumstances, killing the dogs would not bring the horse back, protect the public or any other animals, reasonably likely ensure that the horse's attacker has actually been disposed of, or otherwise accomplish anything more than compounding one appalling tragedy with another. I would reverse the conviction in this matter, or, failing that, I would reverse the trial court's order

to have the dogs killed and remand for entry of an order instead confining the dogs to defendant's premises. If nothing else, this Court should vacate the trial court's order to have the dogs killed because the trial court *per se* abused its discretion by failing to recognize that it had the discretion to order the dogs confined to defendant's premises, and it should remand for the trial court to expressly consider which of the two possible sanctions authorized by MCL 287.286a(2) is the most appropriate under the circumstances.

/s/ Amy Ronayne Krause